# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JEANETTE RILEY | : | Case No. 1:13-CV-00749 |
| Plaintiff, | : | |
| vs. | : | |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF SOCIAL SECURITY | | MEMORANDUM DECISION AND ORDER |
| | : | |
| Defendant. | | |

## I. INTRODUCTION.

The parties consented to have the undersigned United States Magistrate Judge conduct any and all proceedings, including entering judgment in accordance with 28 U. S. C § 636(c) and FED. R. CIV. P. 73.  Plaintiff seeks judicial review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II the Social Security Act (Act).  Pending are the Briefs on the Merits filed by the parties (Docket Nos. 12 & 14).  For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On September 29, 2010, Plaintiff, with the assistance of the Social Security Administration, completed an application for DIB, alleging that she became unable to work because of her disabling

condition on June 4, 2010 (Docket No. 11, pp. 144-145 of 593). The application was denied initially

and upon reconsideration (Docket No. 11, pp. 99-102; 106-108 of 593). Plaintiff's request for

hearing was granted and on February 16, 2012, Plaintiff, represented by counsel, and Vocational

Expert (VE) Mark A. Anderson, appeared before Administrative Law Judge (ALJ) George D.

Roscoe (Docket No. 11, p. 33 of 593). On March 8, 2012, the ALJ issued an unfavorable decision,

finding that Plaintiff had not been under a disability as defined in the Act from the date her

impairment began through the date of the ALJ's decision (Docket No. 11, pp. 10-28 of 593). The

ALJ's decision became the final decision of the Commissioner when the Appeals Council denied

review of the ALJ's decision on March 11, 2013[1] (Docket No. 11, pp. 5-7 of 593). Plaintiff timely

filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying

benefits (Docket No. 1).

### III. PLAINTIFF'S HEARING TESTIMONY.

Plaintiff, a divorcee, was 44 years of age, 5'10" tall and weighed 253 pounds. Plaintiff

completed the eleventh grade and could read, write and perform simple mathematics. Plaintiff lived

with her two children and her boyfriend. Her source of income was unemployment compensation.

Plaintiff owned a car and could drive short distances (Docket No. 11, pp. 37-38; 48; 57 of 593).

During the fifteen years preceding June 2010, Plaintiff had been employed in the commercial

"cleaning business" primarily as a working supervisor. In that capacity, Plaintiff cleaned

commercial facilities using small appliances such as vacuums and dusters, managed personnel,

---

[1]

The Appeals Council received additional evidence which was incorporated into the record and considered by Council in
determining disability. Specifically, results from the MRI of Plaintiff's right knee administered on June 7, 2012, confirmed the
presence of a lateral meniscal tear. Degenerative chondral (pertaining to cartilage) changes were observed in the lateral and
patellofemoral compartments (Docket No. 11, pp. 590-591 of 593; STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

completed some "paperwork" prior to the use of computers and packed extremely heavy supplies. Plaintiff recalled that she had back problems during the latter part of 2009 and that her problems worsened because of continued work and travel to cleaning jobs in various Cleveland suburbs. Plaintiff began accumulating up to ten incidents of tardiness per month, often up to 45 minutes per occasion. In addition, she was absent from work at least twice monthly. In June 2010, Plaintiff was laid off due to both poor attendance and poor job performance (Docket No. 11, pp. 38-40; 52; 53; 54; 55; 56 of 593).

Now, Plaintiff was unable to work because of severe back, neck and knee issues, asthma and depression. In 2007, she had undergone a clavicle excision in her right shoulder and a similar excision was planned in her left shoulder pending medical improvement in her arm. In October 2010, Plaintiff underwent a shoulder decompression and at the time of the hearing, she was still undergoing physical therapy. Plaintiff had not yet developed full mobility in her left arm and she continued to experience pain (Docket No. 11, pp. 40; 41; 43 of 593).

Similarly Plaintiff was experiencing persistent pain that radiated from her neck to her lower back to her tailbone and then to her legs. Once her physician administered injections to manage her pain, Plaintiff gained weight. The weight gain caused additional pressure and pain on Plaintiff's knees. Plaintiff noticed swelling when sitting for long periods of time and her pain was exacerbated when walking, standing and sitting for long periods of time. As a result of the pain and swelling, Plaintiff estimated that she could:

- Walk no longer than five minutes, ten at most.
- Not bend at all because of the pulling on her spine.
- Manipulate with her fingers.
- Lift two pounds.
- Sit up to 30 minutes before having to stand.
- Move a utensil (Docket No. 11, pp. 44; 45; 46; 52; 57 of 593).

3

Plaintiff counseled with a pain psychologist once weekly, adhered to a drug regimen which included Percocet®, Neurontin®, Etodolac and a nebulizer, and used a Transcutaneous electrical nerve stimulation unit twice daily.  When her lungs were inflamed and obstructed, Plaintiff could not walk far or climb without experiencing shortness of breath.  The side effects of her medication included lightheadedness and dizziness (Docket No. 11, pp. 42-44; 46-47; 57 & 66 of 593).

Plaintiff also suffered with depression, the onset of which was caused by prospective surgery needs, an unhealthy marriage and the loss of her father.  Plaintiff admitted that she had been prescribed antidepressants after her first surgery.  She had undergone therapy to learn relaxation techniques to cope with the depression stemming from her pain (Docket No. 11, pp. 57; 58 of 593).

Plaintiff did not suffer from total memory loss but she was forgetful.  She occasionally watched television and she had no difficulty comprehending the story line.  Plaintiff did have difficulty dealing with crowds so she did not socialize, mingle or visit friends frequently.  Occasionally, friends would visit at her home, and periodically, she talked to her friends on the telephone.  Plaintiff did some of the grocery shopping(Docket No. 11, pp. 44, 46-47 of 593).

Plaintiff had difficulty sleeping so dosages of Trazodone and Neurontin® had been increased.  Because she could lift her hands only to shoulder level and her left shoulder was practically immobile, Plaintiff required assistance with showering and washing her hair.  Plaintiff dressed on her own and attempted to assist her daughter with simple tasks.  Her daily activities typically included getting to physician appointments and therapy sessions.  Plaintiff exercised consistently with her physician's advice (Docket No. 11, pp. 48-49; 51 of 593).

### IV. THE VE'S HEARING TESTIMONY.

The VE, a licensed professional counselor and board-certified VE, appeared for the purpose

of giving impartial opinion testimony.  Plaintiff's counsel did not object to the VE's professional

qualifications and identified the VE as an expert whose opinions could be presented at the hearing.

The VE affirmed that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL

TITLES (DOT), a universal classification of occupational definitions and how the occupations are

performed (Docket No. 11, p. 51 of 764; www.occupationalinfo.org).  Consistent with Plaintiff's

descriptions and the classifications in the DOT, the VE categorized Plaintiff's past relevant work

at the exertion and skill levels at which Plaintiff actually performed them:

| JOB/DOT | LEVEL OF EXERTION | SKILL LEVEL | SPECIFIC VOCATIONAL PREPARATION LEVEL |
|---|---|---|---|
| **Housekeeper** **DOT 323.687-014** Cleans rooms and halls in commercial establishments, performing any combination of duties, including but not limited to sorting, counting, folding and replenishing supplies. | Light level of exertion which involves lifting no more than 20 pounds a time with frequent lifting or carrying of objects weighing up to 10 pounds. It requires a good deal of standing and walking. 20 C. F. R. § 4-4/1567(b). | Unskilled work is work that requires little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C. F. R. § 404.1568(a). | |
| **Executive housekeeper** **DOT 321.137-010** A person who supervises work activities of cleaning personnel to ensure clean, orderly attractive rooms in hotels, hospitals, and similar establishments. | Medium level of exertion which involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. Requires standing and walking 6 out of 8 hours, use of the arms and hands necessary to grasp, hold and turn objects with frequent bending and stooping. 20 C. F. R. § 404.1567(c). | Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed to obtain the proper form, quality or quantity of material to be purchased. 20 C. F. R. § 404.1568 (c). | The amount of time required by the typical worker to learn the techniques, acquire the information and develop the facility for average performance of this job is over 1 year up to and including 2 years. |

Because of the manner in which Plaintiff performed these jobs, she had not developed universal

skills that would transfer to another type of work (Docket No. 11, p. 61 of 593).

The ALJ posed the <u>first</u> hypothetical to the VE:

Assume an individual of 44 years of age, who has an 11th grade education, can read
and write and perform simple mathematics.  Assume further, that this person is
limited to sedentary work, with additional non-exertional limitations, specifically no
climbing ladders, ropes or scaffolds, occasional climbing of ramps and stairs,
balancing, stooping, kneeling, crouching, crawling and overhead reaching; that she

can perform routine tasks involving infrequent changes; superficial social interactions and no strict time pressures or production quotas.

The VE opined that this hypothetical person could not perform Plaintiff's past relevant work; however, the hypothetical worker could perform the following sedentary[2], unskilled positions identified in the DOT and identified by the numbers that exist locally, statewide and in the nation:

| JOBS/DOT | NORTHEAST OHIO | STATE OF OHIO | NATION WIDE |
|---|---|---|---|
| Document preparer DOT 249.587-018 | 4,000 | 19,000 | 180,000 |
| "Patcher" DOT 723.687-010 | 4,500 | 25,000 | 280,000 |
| Heat Sealer DOT 559.687-014 | 3,500 | 8,000 | 180,000 |

(Docket No. 11, pp. 62-63 of 593).

The ALJ posed the second hypothetical to the VE:

Assume the same individual of 44 years of age, who has an 11th grade education, can read and write and perform simple mathematics, with the same work background and residual functional capacity, but with the additional limitations that due to impairments, she would be off task 20% of the time. Could such individual perform past work or other jobs existing in significant numbers in the economy?

The VE explained that relying on an engineering standard known as *Methods Time Measurement* which typically sets production rates and incorporates 10% of the work time as off task time, there would be no work for someone who is off task 20% of the time (Docket No. 11, pp. 63-64 of 593; www.enmtm.com).

---

2

Sedentary work involves lifting nothing weighing over ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C. F. R. § 404.1567 (Thomson Reuters 2013).

## V. MEDICAL EVIDENCE.

The ALJ needs specific medical evidence to determine whether Plaintiff is disabled.  Plaintiff is responsible for providing that evidence.  The following is a summary of the medical evidence submitted by Plaintiff.

On May 1, 2006, Plaintiff presented to Dr. Daniel L. Turner, D.O., with complaints of right shoulder pain that had progressed over three years, chronic rhinitis (inflammation of the nasal mucous membrane) and right middle finger pain.  Radiographic evidence showed:

- Degenerative changes involving the acromioclavicular (AC) (denoting the articulation and ligaments between the clavicle and the acromion of the scapula) joint but no radiographic evidence of acute bony abnormality.
- No fracture, dislocation, radiopaque foreign bodies or acute bony abnormality in the humerus.
- No fracture or dislocation of the right middle finger.

Dr. Turner recommended physical therapy for the shoulder pain and prescribed a nasal spray for chronic rhinitis (Docket No. 11, p. 294-297; 304; 306 of 593; STEDMAN'S MEDICAL DICTIONARY 5320, 356090 (27th ed. 2000); www.healthgrades.com/physician/dr-daniel-turner-29k9r)).

Results from the lipid panel evaluation administered on May 30, 2006, showed a lower than normal high density lipoprotein cholesterol level (Docket No. 11, p. 292 of 593).

On June 13, 2006, Dr. Michael E. Moore, M. D., administered an injection in Plaintiff's right shoulder to treat acute and chronic pain.  On October 31, 2006, Plaintiff reported to Dr. Moore that the relief from the injection had been short-lived and that she did go to physical therapy briefly.  Upon physical examination, Dr. Moore noted no deformity and the provocative tests for a rotator cuff tear were positive.  Dr. Moore diagnosed Plaintiff with rotator cuff tendinitis and AC joint arthritis (Docket No. 11, pp. 284-285; 286 of 593).

7

Radiological examinations were made of Plaintiff's right middle finger on November 8, 2006 and her right shoulder on November 9, 2006.  The bony structure of her finger was intact and there was no evidence of fracture, dislocation or radiopaque foreign bodies.  Plaintiff's right shoulder examination showed a partial thickness undersurface tear of the supraspinatus muscle (intrinsic (scapulohumeral) muscle of the shoulder joint, the tendon of which contributes to the rotator cuff) with small bone thickness and small joint effusion (Docket No. 11, pp. 285-286; 303 of 593; STEDMAN'S MEDICAL DICTIONARY 263290 (27th ed. 2000)).

Dr. Moore administered injections in Plaintiff's right shoulder on November 14, 2006 and on November 20, 2006, Plaintiff reported that she had a full range of motion with minimal pain.  Plaintiff reported that she was exercising and taking Aleve® for pain.  Plaintiff was given a medical release to return to work.  During the follow-up visit on December 21, 2006, Dr. Moore explained that the results from the magnetic resonance imaging (MRI) confirmed the presence of arthritis and partial-thickness rotator cuff tear.  Having undergone physical therapy with minimal improvement, Plaintiff was seriously considering surgical treatment (Docket No. 11, pp. 279-280; 281-282 of 593).

On December 5, 2007, Plaintiff presented to Dr. Turner with nasal congestion, a headache and facial pain and Dr. Turner diagnosed Plaintiff with acute sinusitis, prescribed a nasal spray and an antibiotic.  Plaintiff weighed 228 pounds (Docket No. 11, p. 275-279 of 593).

At Dr. Turner's request, Dr. Howard G. Epstein, M.D., a rheumatologist, conducted an evaluation of Plaintiff's joint pain on April 1, 2008.  Acknowledging Plaintiff's history of untreated arthritis, crepitus in the knee, esophageal reflux, anxiety, neck pain which did not radiate outward, chronic rhinitis, obesity, rotator cuff syndrome, local osteoarthritis and a sprained rotator cuff, Dr. Epstein ordered a myriad of tests including a complete blood count and metabolic panel.  Dr. Epstein suspected that Plaintiff had mild anterior knee pain disease.  On this date, Plaintiff weighed 233

8

pounds and her body mass index (BMI) (an anthropometric measure of body mass, defined as weight in kilograms divided by height in meters squared) was 32.61 (Docket No. 11, pp. 268-271 of 593; www.healthgrades.com/physician/dr-howard-epstein-xx5y5); STEDMAN'S MEDICAL DICTIONARY 202100 (27th ed. 2000)).

The results from several tests administered on April 8, 2008, showed:

- A lower level of calcium, hemoglobin, hematocrit and mean corpuscular hemoglobin than what is considered a normal value in the healthy population.
- A higher range of white blood cells than what is considered a normal value in the healthy population.
- Mild degenerative changes in the knees (Docket No. 11, pp. 272-273 275 of 593).

On April 11, 2008, Dr. Epstein noted that Aleve® was successful in alleviating Plaintiff's knee pain. There were no complaints of swelling or joint pain. There was clinical evidence of anemia (Docket No. 11, pp. 263-266 of 593).

Plaintiff presented to Dr. Turner on May 9, 2008 with complaints of nasal congestion, watery and itchy eyes and a burning sensation in her nostrils. Dr. Turner diagnosed Plaintiff with chronic rhinitis and prescribed Claritin-D for a 24-hour period. Plaintiff weighed 235 pounds and her BMI was 35.21 (Docket No. 11, pp. 259-263 of 593).

On September 16, 2009, Plaintiff presented to Dr. Tod R. Podl, M. D., a family practitioner, complaining of nausea that was of the severity to obstruct her sleep cycle. Dr. Podl prescribed an antibiotic and medication typically used to treat and prevent stomach ulcers (Docket No. 11, pp. 256-258 of 593; www.healthgrades.com/physician-dr-tod-podl-xfvv8)).

On March 18, 2010, Plaintiff presented to the Euclid Hospital, a Cleveland Clinic Hospital (EHCCH), complaining of abdominal pain, flank pain and vomiting. Laboratory tests revealed no liver or pancreas problems. Plaintiff was diagnosed with gastritis and prescribed Vicodin for pain. Plaintiff weighed 235 pounds (Docket No. 11, pp. 238; 239; 241; 245; 248; & 249-250 of 593).

Plaintiff presented to Dr. Podl on March 23, 2010, with concerns about her lower back and abdominal pain. Diagnosed with lumbago (a descriptive term for pain in mid and lower back but not of any specifying cause), and epigastric abdominal pain, Dr. Podl continued the drug regimen, adding a prescription of Nexium® and Prilosec without an associated diagnosis (Docket No. 11, pp. 252-254 of 593; STEDMAN'S MEDICAL DICTIONARY 233310 (27th ed. 2000)).

Mr. Richard C. Halas, M. A., a clinical psychologist, evaluated Plaintiff on December 16, 2010, at the request of the Bureau of Disability Determination to determine Plaintiff's "current levels of adjustment and mental status to facilitate long-term disability determination with her." During the clinical interview and mental status evaluations, Mr. Halas observed and/or noted that:

- Plaintiff had little or no difficulty sitting, standing or walking.
- Plaintiff's ability to lift, carry and handle objects was poor and below average.
- Plaintiff's hearing was intact.
- Plaintiff's speech was slow and constricted, anxious and tearful.
- Plaintiff's capacity to travel was intact.
- Plaintiff did not drive because her car was repossessed.

Mr. Halas made the following determinations using the categorizations used by mental health professionals in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS:

| AXIS | WHAT IT IS | WHAT IT MEASURES | MR. HALAS' APPLICATION TO PLAINTIFF |
|------|-----------|------------------|-------------------------------------|
| I | Clinical disorders. | This is what the clinician actually thinks of as the diagnosis | Major depression, Generalized Anxiety Disorder. |
| II | Developmental disorders and personality disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood.<br><br>Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world. They include Paranoid, Antisocial, and Borderline Personality Disorders. | No diagnosis. |
| III | Physical conditions. | Which play a role in the development, continuance, or exacerbation of Axis I and II Disorders. | Deferred for medical examination. |

10

| IV | Psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Unemployment, financial concerns, health concerns, needing to have surgery and constant pain. |
|---|---|---|---|
| V | Highest level of functioning. | On the final axis, the clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Plaintiff's global assessment of functioning score is 45 for serious symptoms. Plaintiff has significant psychological issues. Functional severity is at 65, a score that denotes some mild symptoms (ex: depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships, Plaintiff having reported many friends. Plaintiff's overall GAF is 45. |

In addition, Plaintiff had the mental ability to:

- Follow through was intact and not impaired.
- Maintain attention and concentration to perform simple, repetitive tasks was intact and not impaired.
- Relate to others, including fellow workers and supervisors showed *marked* impairment. Symptoms of depression and anxiety were likely to place significant restrictions on her effective and appropriate interactions with other.
- Withstand the stresses and pressures associated with day-to-day work activities was assessed as having *marked* impairment.

(Docket No. 11, pp. 308-312 of 593).

Plaintiff underwent an X-ray of the lumbar spine and left shoulder. Results from the X-ray of the lumbar spine showed evidence of minimal scoliosis. Results from the X-ray of the left shoulder showed that the socket of the humeral joint and AC joints spaces were preserved. There was no evidence of acute fracture or dislocation (Docket No. 11, pp. 313 of 593).

On March 10, 2011, Dr. Eulogio Sioson, M. D., an internist, conducted a one time disability evaluation. Plaintiff's medical problems included neck, back and joint pains, chest pain and history of depression. Dr. Sioson concluded that:

- Neck, back and joints showed no gross deformity, inflammatory change in the joints or apparent radiculopathy.
- Chest pain and dyspnea showed no overt congestive heart failure with atypical chest pain.

11

- Depression was not emotionally labile and was able to maintain attention and concentration.
- Obesity showed a BMI of 34.
- Considering the limited range of motion from pain and above findings, work related activities would be limited to light or sedentary work.
- The range of motion in Plaintiff's cervical spine, shoulders, dorsolumbar spine, hips and knees was not normal.
- The range of motion in Plaintiff's ankles, hands-fingers, wrists, and elbows was normal (Docket No. 11, pp. 314-318 of 593; www.healthgrades.com/physician/dr-eulogio-sioson-yyw66)).

Dr. Podl examined Plaintiff on April 12, 2011, for complaints of lightheadedness, dizziness, profuse sweating, extremity swelling and weakness.  Dr. Podl supplemented Plaintiff's drug regimen with Oxycodone and a topical cream upon diagnosing her with seborrheic dermatitis, a common scaly macular eruption that occurs primarily on the face, scalp (dandruff), and other areas of increased sebaceous gland secretion, and anxiety.  Plaintiff weighed 242 pounds (Docket No. 11, pp. 320-322; 572 of 593; STEDMAN'S MEDICAL DICTIONARY 107520 (27th ed. 2000)).

On June 1, 2011, Dr. Alfred J. Cianflocco, a sports medicine specialist, observed that Plaintiff had slumped posture, rounded shoulders, a slumped head, an accentuated lumbar lordosis with a protuberant abdomen and diffuse tenderness to light touch in the neck.  He continued the conservative drug treatment which consisted of non steroidal anti-inflammatory drugs and physical therapy pending further neurologic and a rheumatological evaluations (Docket No. 11, pp. 410-413 of 593; www.healthgrades.com/physician/dr-alfred-cianflocco-2vh99)).

Plaintiff presented to the EHCCH on June 5, 2011, with a toothache.  Plaintiff was diagnosed with dental caries, given pain medication and referred for further treatment by a dentist (Docket No. 11, pp. 351-358 of 593).

From June 9, 2011 through July 27, 2011, Sandy Hanson, P.T., devised a plan for treatment which included muscle massages, aquatic therapy, exercises therapy and medication therapy, to

address neck pain, low back pain and bilateral shoulder impingement.  Plaintiff generally tolerated the sessions well and occasionally achieved some of her short term goals.  Yet, at the conclusion of these sessions, Plaintiff explained that she continued to experience severe, constant shoulder and low back pain (Docket No. 11, pp. 359-398; 455-497 of 592).

At the follow-up examination on July 27, 2011, Plaintiff continued to characterize her pain as stabbing, throbbing, hot burning, dull/aching and penetrating.  Dr. Cianflocco ordered an MRI scan of Plaintiff's shoulder although there were no neurologic findings (Docket No. 11, pp. 424-425 of 593).

The results from the MRI of Plaintiff's shoulder administered on August 2, 2011, showed:

- Canal and foramina are patent at C2-C3.
- Canal and foramina are patent at C3-C4.
- Evidence of a small posterior disk protrusion to the right of the midline, minimal ventral cord flattening at C4-C5
- Central discosteophyte change results in a minimal midline ventral cord deformity at C5-C6.
- Canal and foramina are patent at C6-C7.
- Canal and foramina are patent at C7-T1.

The differences between the results from this MRI and the results from an MRI administered in November 2006, were indicative of inflammation of the supraspinatus and reactive edema in the AC joint consistent with degenerative arthritis.  Dr. Cianflocco referred Plaintiff to pain management (Docket No. 11, pp. 400-406; 407-409 of 593).

On August 29, 2011, Dr. James S. Williams, M. D., a sports medicine specialist, injected Plaintiff with a combined anesthetic, nerve block agent and steroid hormone (Docket No. 11, p. 422 of 593; www.healthgrades.com/physician/dr-james-williams-x44gq)).

On September 12, 2011, Dr. Williams conducted a followup examination, explaining that the MRI of Plaintiff's shoulder administered on September 1, 2011, showed the presence of a really

13

significant rotator cuff tear (Docket No. 11, pp. 421-422; 432-433 of 593).

On October 3, 2011, Dr. Pohl attributed Plaintiff's unspecified chest pain to soft tissue pain. Plaintiff weighed 239 pounds (Docket No. 11, pp. 577-580 of 593).

Dr. Williams performed a left arthroscopic subacromial decompression followed by a mini open rotator cuff repair with distal clavicle excision on October 12, 2011 (Docket No. 11, pp. 498-499 of 593).

Plaintiff actively participated in therapeutic exercise on October 16, 2011, October 19, 2011, and October 24, 2011.  As a result, Plaintiff's daytime pain decreased more than her nighttime pain (Docket No. 11, pp. 447-454 of 593).

To assist with pain management, Plaintiff underwent a significant number of psychiatric counseling sessions during November 2011 and December 2011, each of thirty minutes' duration. Dr. Jill H. Mushkat, Ph.D., a psychologist, used modality individual therapy to assist Plaintiff in the exploration of how her actions impacted her mood and to learn pacing and coping skills, relaxation techniques and mechanisms to decrease her pain and stress (Docket No. 11, pp. 441-445; 508-509; 513-514; 518-519; 523-524; 525-526; 529-530; 547-561 of 593).

On December 29, 2011, Dr. Pasha Saeed, a pain medicine specialist, obtained two digital spot fluoroscopic images of Plaintiff's lower lumbar spine.  Dr. Saeed concluded that the results were indicative of inflammation of the nerves in the lumbar and sacral region (Docket No. 11, pp. 564-565 of 593; www.healthgrades.com/physician/dr-pasha-saeed-25nvl).

On January 5, 2012, Plaintiff presented to the EHCCH with complaints of abdominal pain, flank pain and vomiting.  A thorough examination of the following systems showed these results:

- Echocardiogram results were borderline, showing evidence of sinus tachycardia and possible left atrial enlargement.
- Respiratory examination results were within normal limits (WNL).

14

- Vascular examination results were WNL.
- No peripheral, vascular or cardiac edema.
- Neuro-cognitive–perceptual examination was WNL.
- Neuro-musculoskeletal was WNL.
- Gastrointestinal examination was WNL.
- Genitourinary examination was WNL.
- Chloride level was lower than the set values used by health professionals to determine what is normal.
- Alanine aminotransferase enzyme level exceeded the set values used by health professionals to determine what is normal.
- Head, eyes, ears, nose and throat examinations were intact without noted deformity, drainage or difficulty swallowing.
- Musculoskeletal examination was WNL.

Ultimately, Plaintiff was prescribed a medication designed to prevent nausea and vomiting.  Plaintiff weighed 238 pounds (Docket No. 11, pp. 501-506; 531-543 of 593).

On February 10, 2012, Dr. Pohl treated Plaintiff for dyspnea and wheezing that had persisted for a couple of months.  When Plaintiff's chest X-rays from that date were compared to the prior study of September 22, 2011, no acute process was evident (Docket No. 11, pp. 581-586 of 593).

On February 20, 2012, Plaintiff underwent an MRI of the lumbar spine.  The results showed:

- T12-L1    canal and foramina are patent.
- L1-L2     canal and foramina are patent.
- L2-L3     canal and foramina are patent.
- L3-L4     mild facet degenerative change.  Canal and foramina are patent.
- L4-L5     mild facet degenerative change.  Canal and foramina are patent.
- L5-S1     mild facet degenerative change.  Canal and foramina are patent.

In conclusion, Dr. Paul Ruggieri, M.D., diagnosed Plaintiff with mild facet degenerative changes without significant canal or foraminal stenosis; otherwise the study was normal (Docket No. 11, pp. 569-570 of 593).

### VI.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available

only for those who have a "disability." *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)). To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires. *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520. *Colvin*, *supra*, 475 F. 3d at 730. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her

16

past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VII. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings of fact:

1. At step one, Plaintiff met the insured status requirements of the Act through December 31, 2014.  She had not engaged in substantial gainful activity since June 4, 2010, the alleged onset date.

2. At step two, Plaintiff had six severe impairments:

   - Degenerative arthritis of the shoulders with a left rotator cuff tear.
   - Degenerative changes in the cervical spine.
   - Degenerative changes in both knees.
   - Obesity.
   - Major depressive disorder (MDD).
   - Generalized anxiety disorder.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that she:

   - Cannot climb ladders, ropes or scaffolds.
   - Can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl or reach overhead.
   - Can perform only routine tasks with infrequent changes, superficial social interactions and no strict time pressures or production quotas.

4. At step four, Plaintiff was unable to perform any past relevant work.

5. At step five, Plaintiff was 43 years of age on the date she alleged that her disability began and Plaintiff had a limited education and was able to communicate in English.

17

6.  Considering her age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

7.  Plaintiff had not been under a disability, as defined in the Act, from June 4, 2010 through the date of this decision or March 8, 2012.

(Docket No. 11, pp. 13-28 of 593).

## VIII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). A district court's review is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

18

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Consequently, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). The ALJ's decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IX. PLAINTIFF'S ARGUMENTS.

Plaintiff argues that the ALJ committed reversible error by failing to:

1. Consider that Plaintiff had the RFC for less than sedentary work.
2. Consider that Plaintiff had an impairment or a combination of impairments that met or equaled the severity of an impairment in the Listing.

Defendant counters that the ALJ applied the proper legal standard to evaluate Plaintiff's medical records and that the ALJ's decision is substantially supported by the medical evidence. Defendant offers specific, legitimate reasons that the Court should reject Plaintiff's argument:

1. The ALJ did not err in finding that Plaintiff retained the RFC to perform overhead reaching.
2. The ALJ did not err in his analysis of Plaintiff's impairments and whether such impairments, individually and in combination, satisfied the requirements of the Listing.

## X. DISCUSSION.

A    **AN RFC FOR LESS THAN SEDENTARY WORK**.

Plaintiff argues that she was unable to use at least one of her extremities for a continuous period exceeding twelve months.  She speculates that when she has surgery on her other extremity she will be equally incapacitated.  Plaintiff has therefore concluded that the ramifications of this loss are:

- She is precluded from performing a full range of sedentary work.
- She cannot return to her past relevant work.
- Her performance of any other work is precluded by her RFC.

### 1. THE LAW

RFC is what an individual can still do despite his or her functional limitations and restrictions caused by his or her medically determinable physical or mental impairments.  TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, Social Security Ruling (SSR) 96-9p, 1996 WL 374185, *1 (July 2, 1996).  It is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities.  *Id.*

The RFC assessment considers only those limitations and restrictions that are caused by an individual's physical or mental impairments.  *Id.* at *2.  It does not consider limitations or restrictions due to age or body habitus, since the Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s).  *Id.* (*See* SSR 96-8p, "TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS.")

20

The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  *Id.*  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.  *Id.*

A finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled."  *Id.*  If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.  *Id.*

### 2.  PLAINTIFF'S RFC.

At the time of hearing and even when the ALJ rendered his opinion, Plaintiff had not yet attained the age of 50.  Thus a finding of whether she is disabled because she can perform less than sedentary work rests primarily on the nature and extent of her functional limitations and restrictions.

The Magistrate finds that if Plaintiff's allegation that she cannot use her limb for a continuous period exceeding twelve months is true, the complete inability to use her left upper extremity is indicative of an impairment or a symptom of an impairment from which Plaintiff suffers, not an assessment of what Plaintiff can and cannot do.  Nevertheless, the ALJ's formulation of Plaintiff's RFC follows the guidelines as noted in SSR 96–9p above, for evaluation of the ability to do less than a full range of sedentary exertional limitations.

An accurate accounting of Plaintiff's abilities, limitations and restrictions does not

automatically equate with a finding of disability or preclude the performance of any work.  The ALJ considered Plaintiff's subjective statement that she was unable to use her extremity for at least one year lacking incredible considering the general lack of support from the subjective and objective medical evidence.  At the hearing, Plaintiff testified that she had recently undergone surgery and she had not developed full mobility in her left extremity.  Plaintiff did not testify that she could not use her extremity.  Neither did any medical professional completely prohibit nor limit the use of the left extremity.

Here, the medical evidence suggested that Plaintiff's ability to perform a significant number of jobs may be reduced by her inability to more than occasionally reach overhead with the left extremity.  The literal reading of the ALJ's finding suggests that he accounted for this limited ability to reach overhead only occasionally as opposed to, for example, a complete inability to reach overhead at all.  The ALJ's determination that Plaintiff retained the RFC to perform work at a sedentary level subject to limitations in the ability to lift overhead, is consistent with the medical evidence.  With this limitation, the VE testified that there were a significant number of jobs within the state and national economies that Plaintiff could perform.

The substantial evidence included in the record supports the ALJ's RFC determination that Plaintiff could perform sedentary work subject to the limited use of her left extremity.  The Magistrate is persuaded that the ALJ's RFC assessment in this case is sufficiently complete.

**B.    UNEMPLOYABILITY AND BEING OFF TASK.**

The VE cited to a time study which indicates that the industry norm is that personnel could be off task up to 10% of the day and still maintain the required levels of productivity.  Based on this premise, Plaintiff claims that she is disabled because she is unemployable and she is unemployable

22

because she would be off-task 20% of the time, thereby exceeding the *Methods Time Measurement* paradigm.

The Magistrate finds Plaintiff's claim that she is unemployable and therefore disabled because she would be off task an equivalent of 1.6 hours per day, 8 hours per week, four days per month or 20% of the time, interesting. The problem with this argument is that Plaintiff relies only on her subjective statements concerning her limitations and accordingly, fails to provide a basis for her theory that any of her impairments would cause her to be off task more than 20% of the time. The logical bridge between the evidence and Plaintiff's testimony is that she would, in fact, be off task. The record does not permit an inference that Plaintiff will be off task for 20% or more of her work day or work week.

The ALJ accounted for the limitations in Plaintiff's ability to adapt to changes in the workplace such as being off task for 10% of the day by incorporating an employment atmosphere in which her duties would require only occasional overhead reaching, performance of routine tasks with infrequent changes, superficial social interactions and work at her pace with no strict time pressures or production quotas. For these reasons, Plaintiff's argument is not persuasive.

C.    **DOES PLAINTIFF'S IMPAIRMENT MEET THE LISTING?**

Plaintiff suggests that a reasonable fact-finder would have determined that her inability to perform fine and gross movements is illustrative that her impairment meets or equals LISTING 1.02(B), which states.

> 1.02(B). **Major dysfunction of a joint(s) (due to any cause)**: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

23

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in the **inability to ambulate effectively**, as defined in 1.00B2b[3]; or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c[4].

20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2013).

The Magistrate has reviewed the record and determined that there are radiological images that are indicative of degenerative arthritis, an undersurface tear and rotator cuff tendinitis (Docket No. 11, pp. 275; 280, 281, 284, 285-286; 290; 297-298; 300; 329; 332-333; 336; 339; 341-342; 347; 348; 402-405; 407-408; 410-411; 414; 416-417; 421; 422; 424-425; 427; 428; 430-432; 434; 437 of 593). Assuming *arguendo,* that these impairments could reasonably cause chronic joint pain, there is no evidence of incomplete or partial dislocation of a joint or organ, permanent shortening of a muscle or joint, or joint stiffness due to rigidity of bones. Consequently, Plaintiff cannot satisfy the introductory comments to the Listing that require the presence of a gross anatomical deformity.

Neither can Plaintiff satisfy the criteria in subsection B. Plaintiff suggests that she suffers

---

[3]

(1) **Definition**. **Inability to ambulate effectively** means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00 (Thomson Reuters 2013).

[4]

LISTING 1.00B2c, states:

**What we mean by inability to perform fine and gross movements effectively**. Inability to perform fine and gross movements effectively means an extreme loss of function of **both** upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00 (Thomson Reuters 2013).

from (1) an inability to perform fine and gross movements; (2) limitations in lifting and carrying and (3) functional limitations arising from the degenerative changes to her knees and that these limitations meet the listing requirements. What Plaintiff has shown is a loss of function in the right upper extremity. She has overlooked a critical element of the definition that requires an extreme loss of function in both upper extremities. The ALJ did not err in failing to determine whether Plaintiff's impairment was of the severity to meet 1.02(B) of the Listing.

**D.  DID THE ALJ ACCURATELY ASSESS THE COMBINED IMPAIRMENTS?**

Plaintiff does not take issue with the ALJ's determination that she had severe impairments involving degenerative arthritis of the shoulders with a left rotator cuff tear, degenerative changes in the cervical spine, degenerative changes in both knees, obesity, major depressive disorder and generalized anxiety disorder. Rather, Plaintiff challenges the ALJ's failure to consider that the combined effect of these impairments is of the severity required by the Listing.

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. *Id.* If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (*see* 20 C. F. R. § 404.1520).

> 20 C.F.R. § 404.1523 (Thomson Reuters 2013).

In the Sixth Circuit, it is well established that the ALJ must consider "the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to render the claimant disabled." *Walker v. Secretary of Health & Human Services*, 980 F.2d 1066, 1071 (6th Cir.1992). The ALJ does not necessarily need to provide a detailed "combined effects" analysis. *Loy v. Secretary of Health & Human Services*,

901 F.2d 1306, 1310 (6th Cir.1990).  An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination where he or she specifically refers to the combination of impairments in finding that the claimant does not meet the listing.  *Id.*  It is sufficient for the ALJ to refer to the claimant's impairments and combination of impairments.  *Id.*

In the present case, the ALJ then made specific and well-articulated findings of each individual impairment and made a determination as to whether each one, separately, would qualify Plaintiff for disability (Docket No. 11, pp. 16-19 of 593).  As to the cumulative effect of Plaintiff's impairments, the ALJ explicitly stated that Plaintiff's back, neck and shoulder impairments in combination did not meet the severity required by the Listing (Docket No. 11, pp. 19-21 of 593).  The ALJ even considered the combined impact of Plaintiff's obesity on other impairments in the analysis (Docket No. 11, pp. 18; 22; 23 of 593).

There is every indication that the ALJ fulfilled his duty to consider all of the relevant evidence and that he analyzed the combined effects of all of Plaintiff's impairments.  Plaintiff has not given the Court sufficient evidence or reason to believe otherwise.  Because the ALJ applied the correct legal standards in reaching his decision and there is substantial evidence in the record to support his findings, the Magistrate defers to his decision.

**XI.  CONCLUSION.**

For the foregoing reasons, the Magistrate affirms the Commissioner's decision..

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   November 26, 2013